MORRISON ENTERPRISES, a Kansas General Partnership, Plaintiff,

v.

MCSHARES, INC., a Kansas Corporation, Defendant.

No. CIV. A. 94–1219–MLB.

United States District Court, D. Kansas.

May 1, 1998.

Donald W. Bostwick, Clifford L. Malone, Adams, Jones, Robinson & Malone, Wichita, KS, for Morrison Enterprises, A Kansas General Partnership, plaintiff.

Thomas D. Kitch, Stephen M. Stark, Scott D. Jensen, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for McShares Inc., A Kansas Corporation, defendant.

### *MEMORANDUM DECISION*

BELOT, District Judge.

#### *Introduction*

This is an action for contribution both under Section 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9613(f), and under state law, to recover response costs incurred by Morrison in connection with contamination from grain fumigant containing carbon tetrachloride at the Scoular elevator site in Salina, Kansas. Morrison seeks recovery of response costs incurred to date of trial, and a declaratory judgment concerning McShares' liability for future response costs. The case originally included a cost recovery claim by Morrison under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), but the court entered summary judgment dismissing that claim on December 18, 1996. (Doc. 72).

As the case progressed toward trial, the court made a number of rulings. The ruling which bears directly upon some of the issues discussed and resolved herein is the court's order precluding Morrison's use of expert

testimony at trial (Doc. 15). The court's ruling became the subject of additional orders: Memorandum and Order of November 2, 1995 (Doc. 51); Memorandum and Order of December 18, 1996 (Doc. 72); and Order of August 19, 1997 (Doc. 86). The court did not retreat from its ruling excluding Morrison's experts but did allow Morrison to offer lay opinion testimony pursuant to Fed. R.Evid. 701 (Doc. 72 at 16–18). The court's exclusionary rulings notwithstanding, the court permitted Morrison to make both testimonial and written proffers of excluded testimony and to mark exhibits covered by the proffers so that the Court of Appeals will have the benefit of both the evidence admitted and excluded. Tr. at 438–89 (Shepard); Doc. 91, Ex. 83; Tr. 273–96, 314 (Bean); Exs. 32–47; Tr. at 333–54 (Elder); Exs. 48–61C.

The case came on for trial to the court on August 25–27, 1997. At the conclusion of Morrison's case, the court took under advisement McShares' motion pursuant to Fed. R.Civ.P. 52(c). Tr. at 560. The parties have submitted their suggested findings of fact and conclusions of law (Docs. 92, 93, 97, 98, and 101). Pursuant to Fed.R.Civ.P. 52(a), the court now makes its findings of fact and conclusions of law.

### Expert Evidence Revisited

In its trial brief, Morrison reprises and expands upon its positions regarding the court's exclusion of its use of expert evidence (Doc. 89 at 1–15). As Morrison candidly recognizes, the orders precluding its use of expert evidence resulted from its previous counsel's repeated failures to comply with the rules of procedure, this court's orders, and his own promises to make required expert disclosures. Nevertheless, Morrison continues to argue that it should be allowed to present expert evidence.

 To support an argument that it did identify experts as required, Morrison first notes that its previous counsel *did* file a designation of expert witnesses in the so-called 1992 case, No. 92–1641 (Doc. 20). According to the designation, three experts would testify, in substance, that the cause of the carbon tetrachloride contamination was consistent with the 1963 spill. Morrison's designation was filed approximately two and a half months after the deadline and after

McShares filed a motion to preclude Morrison's use of experts (Doc. 15). Now-retired Magistrate Judge Wooley granted McShares' motion to preclude (Doc. 23). Ten days after filing its tardy expert designation, Morrison moved to dismiss the 1992 case (Doc. 21). Judge Theis granted Morrison's motion to dismiss without prejudice on three conditions: (1) all completed discovery would be applicable in any second lawsuit; (2) Morrison was to pay McShares for attorney's fees for McShares' motion to prohibit Morrison's use of expert witnesses; and (3) any refiling must be accomplished within 90 days (Doc. 36). Judge Theis' order said nothing about whether the *pleadings* from the 1992 case would be applicable to a later-filed case. In the absence of an express condition, proceedings and pleadings in a prior case do not follow the parties into a refiled case. Morrison's designation of experts in case no. 92–1641 did not therefore satisfy Morrison's obligation to file a designation of experts in this case.

Morrison next points to its former counsel's statement at a May 22, 1995 conference to the effect that he had disclosed Morrison's experts in the 1992 case and that *discovery* carried over to this case. While it is true that there was no condition in the 1992 case dismissal that prohibited Morrison from using expert witnesses if the case was refiled, there was no expert discovery to be carried over to this case. Morrison does not contend that any of the experts named in the disallowed designation were deposed in the 1992 case. The designation itself, of course, does not constitute discovery.

Morrison then argues that it has complied with the disclosure requirements of Rule 26(a)(2)(A) because two of the witnesses identified in the 1992 designation, Shepard and Christy, had been investigating the contamination at the Scoular site at Morrison's request prior to the filing of the 1992 case. Morrison shared some of their work product with McShares. Morrison thus concludes that Shepard and Christy were properly identified as expert witnesses in this case as required by Rule 26(a)(2)(A). This argument could be valid only if the orders in the 1992 case are disregarded and the procedural requirements for expert witness disclosure in *this* case are ignored.

Finally, Morrison contends that Shepard and Christy[1] should be allowed to testify because a written report from them was not required under Rule 26(a)(2)(B) since neither were "retained or specially employed to provide expert testimony" within the meaning of the rule. Morrison likens Shepard and Christy to treating physicians and cites cases which hold that treating physicians can testify and give opinions on causation even though they have not provided written reports because they are not specially retained or employed. The court sees little, if any, merit in this analogy. Treating physicians seldom, if ever, are hired to testify against another treating physician. Shepard and Christy were not Morrison's employees. Rather, Morrison retained their company, Kejr Science Group, to help investigate the contamination problem and, as McShares points out (Doc. 90 at 3–4), to help Morrison prove up a case against McShares, if necessary. While part of Shepard's proffered testimony involved causation, it went farther. Just as a standard of care opinion goes beyond factual observations[2] and opinions involving diagnosis, treatment and prognosis, the proof required of Morrison here[3] goes beyond the expert opinions summarized in the designation filed in the 1992 case. Even if the document identified by Morrison's former counsel at the May 22, 1995 hearing, the June 1994 CI Report prepared by Kejr, somehow could be analogized to a medical record, it does not purport to cover all the elements of Morrison's proof (*see* Ex. 42, Section I, Executive Summary, pp. MOO2128–29).[4] This is evident by comparing the CI Report executive summary with Shepard's proffered evidence (Ex. 83) and his testimony. Thus, the court cannot accept Morrison's argument, premised on the treating physician analogy, that Shepard and Christy were not required to provide Rule 26(a)(2)(B) reports and therefore should be permitted to offer expert evidence.

The parties and counsel are aware that the decision to disallow expert evidence has been troubling to the court. Because the court was acquainted with Roger Morrison in college and respects him, and because Mr. Morrison was without fault in the matter, the court personally wishes its decision could have been different. The decision, however, was not made on a personal basis. Rather, it was made on a legal basis, as all such decisions must be if the integrity of the judicial system is to be preserved. The court is not an adherent to "form over substance" application of rules. Nevertheless, Morrison's prior counsel was a member of a respected law firm and was presumptively competent and responsible, yet his conduct was persistent, unexplained and inexcusable. McShares was blameless and entitled to take the position it did. For the reasons stated herein and many times in previous orders, the court believes its decision was correct.

### The Parties

1. Plaintiff, Morrison Enterprises (Morrison), is a general partnership that owns land in Salina, Kansas, upon which its predecessor, Morrison Grain, Inc., constructed grain storage facilities and related improvements in the 1950s.[5] Morrison operated these facilities until 1980 when they were leased to Scoular Grain, which has operated the facilities since that time. The Morrison facilities usually will be referred to herein as the Scoular site.

2. Defendant, McShares, Inc., (McShares) is the successor in interest to Research Products Company[6] which supplied grain fumigants containing carbon tetrachloride to

---

1. No written proffer of Christy's testimony was identified and he did not testify.

2. The court did not preclude Shepard from testifying about observed facts.

3. See Doc. 92 at 18, where Morrison lists the six things it must prove to make a prima facie case.

4. The CI Report was revised in November 1994 (Ex. 51).

5. The issue of successor liability has never been raised during the course of this litigation, and there appears to be no dispute between the parties on this issue. Accordingly, Morrison Grain, Inc., and Morrison Enterprises will be collectively referred to as "Morrison."

6. As was the case with Morrison, McShares does not contest that it is the successor to Research Products Company. All references to the defendant, regardless of the relevant date, will be to McShares.

Morrison and Scoular for use at the Scoular site from the 1950's until approximately 1985.

3. The Scoular site is composed of a grain storage elevator consisting of three sets of multiple concrete silos, five metal grain storage tanks, three grain storage Butler buildings (known as "flat" storage) and other ancillary outbuildings. Pl.'s Ex. 4 and Def.'s Ex. VVVV, attached hereto. The total storage capacity during the relevant times was 10,096,000 bushels. The area surrounding the site is essentially rural, with a significant amount of farm ground and just a few residences. Tr. at 56–59 (Ellis), 617 (Morrison).

*Use of Fumigants at the Scoular Elevator*

4. McShares sold two types of liquid grain fumigants to Morrison—Max High Life and Max Kill 10, both of which were registered pesticides. Max High Life was approximately 80% carbon tetrachloride. Max Kill 10 was approximately 70% carbon tetrachloride. Tr. at 605 (Allen); Trial Exs. 15 and 16. In applying liquid grain fumigants, Morrison followed the instructions on the labels, the procedures recommended by McShares' personnel and literature provided by McShares. Tr. at 77, 84, 97–99; Trial Exs. 77 and 78 (Ellis). Morrison purchased liquid grain fumigants only from McShares. Tr. at 69, 71 (Ellis), 187–88 (Gebhart).

5. Max High Life was used to fumigate the grain in the concrete silos. It was stored in a tank on top of the elevator. The customary fumigation process was to fill each silo about half way with grain and spray the fumigant on the grain surface. Then the silos were filled to the top and the spraying process was repeated. Max High Life, which was heavier than air,[7] penetrated all the way to the bottom of the silo. It was absorbed by the grain kernels and any infestation inside the kernel, as well as outside infestation, was killed. Tr. at 75–78 (Ellis).

6. The grain in the silos was "turned" periodically by moving grain between silos when conditions dictated, e.g., in hot summer months to reduce the temperature of the grain. On these occasions, the fumigation process was repeated. When turning was not required, or when there was no evidence of infestation, the grain was not refumigated. Tr. at 78–79, 168 (Ellis).

7. The grain in the steel tanks and the Butler buildings (flat storage) was fumigated with Max Kill 10. Max Kill 10 was not stored on site, because the quantity of grain stored in the steel tanks and Butler buildings was much greater than that stored in the silos. Instead, McShares brought a tanker truck to the facility and Max Kill 10 was pumped directly from the tanker. The formulation of Max Kill 10 differed from Max High Life, which caused Max Kill 10 to move more slowly through the grain mass. Morrison's employees applied the fumigant by spraying it over the surface of the grain. After applying Max Kill 10, the tanks and buildings then were sealed, and the fumigant, which percolated to the bottom, was allowed to work. Tr. at 80–84 (Ellis). The floors of the Butler buildings were concrete of unknown thickness. Tr. at 59, 63 (Ellis). Occasionally, spot treatment of flat storage was required. It was sometimes difficult to determine the exact area to be spot fumigated and dispersal of the fumigant could be uneven, with high concentrations in some areas and low concentrations in others. Tr. at 143–44 (Ellis). For this reason, Morrison discontinued use of Max Kill 10 to treat the flat storage when a pelletized product known as phostoxin became available. Tr. at 85–86 (Ellis); 179–80 (Gebhart).

8. Morrison did not use liquid grain fumigant for rodent control while Eldred Ellis was elevator manager from 1959 to 1979. However, Ellis admitted that he knew of others in the industry who used carbon tetrachloride to control rats and that he never asked Morrison's employees whether they were doing so. Tr. at 103, 106, 141 (Ellis). Morrison used either a powder or a liquid product sold by McShares specifically for rodent control. Tr. at 102–03 (Ellis), 610 (Allen).[8]

---

**7.** Max High Life weighed 12.6 pounds per gallon, meaning that 1,000 gallons would weigh 12,600 pounds or more than six tons.

**8.** James Allen testified that on a single occasion he observed an unnamed employee of Morrison pour liquid grain fumigant down a rodent bur-

row along the side of the C House of the elevator. Tr. at 578–79. However, he could not recall when this incident occurred, and his conclusion that the liquid being poured into the hole was grain fumigant was based solely on his smell of the odor of grain fumigant, although he was 20

9. McShares has records of the amounts of liquid grain fumigant sold to Morrison and Scoular for certain periods from 1975 to 1984. They show that for that period, McShares sold Morrison and Scoular a total of 80,766 gallons of liquid grain fumigant, or an average of 8,076 gallons per year. Trial Exs. MM and UUUU. James Allen, McShares' president, testified that based upon the general application formulas on the label—1.5 to 2 gallons per thousand bushels of grain—the average annual usage of grain fumigant indicated by McShares records, Trial Ex. UUUU, would treat about 7 million bushels of grain. Tr. at 607. Allen speculated, without benefit of records from 1954–1975, that Morrison used approximately 240,000 gallons of fumigant from the period 1954 through 1985 and that Morrison's use of fumigants during the period from 1959 to the middle 1960s would have been greater than the average figure set forth above. Tr. at 568, 589 and 595–600.[9]

10. Scoular ceased using any liquid grain fumigant which contained carbon tetrachloride by January 1, 1985.[10] After that date, no carbon tetrachloride was used at the Scoular elevator site for any purpose. Tr. at 172–73 (Gebhart).

### The Spill

11. The parties have stipulated that in about November 1963, a spill of Max High Life occurred at the Scoular site when a McShares employee, Walter Bernhardt, was preparing to unload fumigant from the front compartment of a trailer owned and operated by McShares. Pretrial Order (Doc. 80 at 2) and Trial Ex. 15.

12. McShares had purchased the trailer from Morrison sometime shortly after 1959. Tr. at 568, 608 (Allen). After McShares purchased the trailer, it cleaned out any rust from inside the trailer, visually inspected the trailer, repaired hose connections, installed new couplings, and made certain the trailer

was in operating condition. Some of the work was done by Morrison's shop. Tr. at 571–75, 609–10 (Allen).

13. The trailer contained three compartments which could hold a total capacity of approximately 2,400 gallons of grain fumigant. The capacity of the front compartment was 250–300 gallons. Tr. at 10–11 (Bernhardt).

14. The Max High Life used in the concrete elevator was stored in a 5,000 gallon tank located on top of the elevator approximately 130 feet above ground level. Tr. at 14 (Bernhardt), 72, 93 (Ellis). To fill the storage tank, a hose from McShares' trailer was hooked to a quick coupler at the bottom end of a steel pipe which ran up the side of one of the silos. The fumigant was pumped up the pipe to the tank on top. Tr. at 17 (Bernhardt), 73–75 (Ellis); Trial Exs. 8 & 9. The pipe connected near the top of the storage tank. The fumigant was drawn off for use in the concrete silos through a pipe connected to the bottom of the storage tank. Tr. at 75 (Ellis). The storage tank was vented to the atmosphere. Tr. at 75 (Ellis), 187 (Gebhart).

15. The pump used to move the Max High Life from the trailer to the storage tank was located on the back of McShares' tractor unit. On the day of the spill, Bernhardt recalled that he hooked the hose between the pump and the elevator pipe, Tr. at 18, 19, 39 (Bernhardt), but had not yet completed hooking up the hose between the pump and the front compartment of the trailer which held the grain fumigant. Tr. at 21, 22, 42, 45–46 (Bernhardt). Bernhardt normally did not turn on the pump until the hoses were all hooked up, and would not open the valves until the pump was turned on so that "you would have no pressure coming back at you" from fumigant which might be in the pipe. Tr. at 21, 22 (Bernhardt). At

---

to 25 yards away from the unnamed employee. Tr. at 612–13 (Allen). The court does not credit this testimony.

9. While it is undisputed that Morrison used liquid fumigants during the period 1954 through 1975, the court finds that insufficient foundation was laid to support Allen's opinions and therefore the court has chosen to disregard them.

10. James Allen testified that the last date for legal sale of Max High Life was June 1, 1986, and McShares' last sales may have been well ahead of that date. Tr. at 606 (Allen). Max Kill 10 was voluntarily removed from the market by McShares in the mid–1970's. Tr. at 606 (Allen).

the time of the spill, Bernhardt knew that Eldred Ellis, the elevator manager, was standing near the valve on the pipe at the elevator, but he did not know whether the valve had been turned on. Tr. at 47, 51 (Bernhardt). Ellis testified that he had not turned on the valve on the pipe at the time of the spill. Tr. at 93, 135 (Ellis).

16. The spill occurred while Bernhardt was down on his knees trying to hook up the hose from the pump to the front compartment of the trailer. Tr. at 49 (Bernhardt). The hose had a quick coupler which was pushed into the connection on the bottom of the front compartment of the trailer and then clamped in place. Tr. at 22 (Bernhardt). When Bernhardt pushed the hose up to get it connected, the bottom of the front compartment ripped loose at the connection or at a seam near the connection. Tr. at 22–23, 36–37, 49 (Bernhardt). The trailer started to leak right at the connection on the front compartment of the trailer, and there was no way to shut off the flow. Tr. at 23, 36 (Bernhardt). The fumigant came out of the break under pressure and hit Bernhardt in the face and eyes. Tr. at 45 (Bernhardt). Bernhardt testified that the pressure was from the fumigant in the trailer and he did not think that any fumigant came back through the pump. Tr. at 43, 46. The fumigant in the front compartment spilled onto the ground. Tr. at 23 (Bernhardt).[11]

17. While Bernhardt had no idea of the precise volume of fumigant which was spilled,

he thought it was in the neighborhood of 200 to 250 gallons. Tr. at 23 (Bernhardt).

18. The location of the spill is identified by an "X" on Trial Exhibit 2, Tr. at 16 (Bernhardt), and was in the general area of bin 113 and the dump identified on Def. Ex. VVVV, attached. Tr. at 67 (Ellis); Trial Exs. 9 and 10. At that point, a gravel driveway sloped to the northeast toward an embankment between the driveway and the railroad tracks, and the railroad tracks were considerably lower than the driveway surface. Trial Exs. 7, 9, 10, 11, 12; Tr. at 67, 68 (Ellis).

19. Immediately after the spill, Ellis took a water hose and sprayed Bernhardt for some time to wash off the fumigant. Tr. at 24 (Bernhardt), 93 (Ellis).

20. The spilled fumigant and water flowed down the driveway and the embankment toward the railroad tracks. Tr. at 24 (Bernhardt), 94 (Ellis). The fumigant and water ran into a drain or discharge area which had been dug out between the railroad ties of the elevator's siding tracks, and pooled there because it could not get beneath the mainline railroad tracks. Tr. at 94–95 (Ellis). The area where the pooling occurred is identified by the letter "B" on Trial Ex. 2. Tr. at 94 (Ellis). The spill occurred in mid-morning, and the fumigant and water remained in a pool in this area for a number of hours. Tr. at 95–97, 139 (Ellis).[12]

11. There was testimony which leads McShares to suggest that the rupture may have been caused by a "blow-down" of fumigant left in the pipe. Such a "blow-down" could not have occurred unless Ellis opened the valve at the low end of the pipe, something which Ellis credibly denied doing. The court finds that the weight of the evidence does not support this possible cause. There also was testimony from Ellis that Bernhardt "flipped" the hose to remove a kink after connecting it to the trailer, thus causing the rupture. Ellis first claimed to have recalled this event shortly before his deposition; in other words, 33 years after the incident. Bernhardt denied "flipping" the hose. James Allen, McShares' president, testified that the hose was not very flexible and was not subject to kinking. Tr. at 572–73. The court finds Bernhardt's and Allen's testimony to be more credible and reliable regarding the circumstances which lead to the rupture.

12. McShares cites the lack of specific evidence regarding the size of the pool of fumigant and water, as well as Bernhardt's testimony that fumigant "evaporates pretty fast" and argues that in the absence of expert testimony, the court cannot conclude whether the fumigant entered the soil or groundwater. The court disagrees with the first proposition. The evidence was that the area where the water and fumigant "pooled" was soil, that the fumigant was substantially heavier than water, that approximately 250 gallons of fumigant was spilled and that no effort was made to recover it by vacuuming or some other method. It is reasonable to infer that a substantial amount of fumigant entered the soil.

The second proposition is more problematic. Fumigant in soil does not automatically mean fumigant in groundwater.

*Other Potential Sources of Carbon Tetrachloride Contamination*

21. The sets of concrete silos were constructed on so-called "floating foundations" of approximately 36 inches of concrete. The exterior walls of the outer rows of silos came in contact with the ground. Depending on the elevation of the ground surrounding the elevators, portions of the silos could be 10–20 feet below ground level and, therefore, were not subject to visual inspection from the outside. The floors of the silos were concrete of unknown thickness. Tr. at 149–50, 156, 158, 167–68 (Ellis).

22. The interiors of silos on the outside rows of the elevator could be accessed by small doors on the outside wall of each silo. The outside silos had flat concrete floors. There were two types of inner silos between the rows of outside silos on A and B houses: rows of silos which were of the same size as the outside silos and smaller silos in the spaces or "interstice" between the larger silos. The interior of these inner silos could not be accessed by doors and their floors tapered to hoppers. Tr. at 615–17 (Morrison); Def. Ex. VVVV.

23. Below the concrete floors of the inner row of silos were five interconnecting tunnels which housed conveyor belts used to move grain. The ceilings of the tunnels, in effect, were the floors of some of the silos. However, only a portion of the floors was visible from the tunnels. The grain in the outside silos was extracted by means of chutes leading downward at a 45$ angle from the bottom of the silos to the conveyor belts in the tunnels. The grain in the inner silos was extracted through the hoppered bottoms of the silos. Tr. at 156, 158, 167–68 (Ellis).

24. The water table was so high in the vicinity of the elevators that there was a severe seepage problem in some areas of the tunnels. The problem was so serious that it could not be solved with a sump pump, so Ellis installed three "dewatering wells." The purpose of the "dewatering wells" was to pump water from the groundwater table outside the tunnel walls and from below the bottom of the elevator tunnels. The "dewatering wells" functioned as intended. Tr. at 120–21, 161, 162, 166–67 (Ellis).

25. During Ellis' tenure as elevator manager (1959–1979), there were no spills of grain fumigant at the site other than the one by Bernhardt. Tr. at 99 (Ellis). As elevator manager, Ellis made regular inspections of the elevator two times each day by walking through the elevator, around the buildings, and through the underground tunnels. Liquid grain fumigant has a pungent odor, but Ellis did not recall ever detecting the presence of grain fumigant on his daily inspection tours, and did not see any indication of the presence of liquid grain fumigant in the tunnels below the concrete silos. Tr. at 87, 88, 147.

26. Before, during and after the 20–year period Ellis managed the Morrison Facility, the concrete elevator experienced "fallouts," which happened when a "portion of the wall separates and allows the grain to exit that silo." The cause of the fallouts was improper construction: "the steel was not tied behind the jack rod." Tr. at 61, 116–18 (Ellis). Ellis never observed any evidence of leakage on the silo walls. Tr. at 146, 164–65.

27. It was not Ellis' practice to go into the silos when they were empty and he did so only on "rare occasions." Although there was a suspension device that would have allowed a person to be lowered from the top to inspect the interior of each silo, it was never used for this purpose. Tr. at 117–18 (Ellis).

28. Ellis informed Roger Morrison that it was entirely possible that there were cracks in the floors of the flat storage buildings through which fumigant could have percolated over the years. Tr. at 118 (Ellis).

29. Ellis was present only about 20% of the time when the concrete silos were fumigated. Tr. at 142. He believed that the employees attempted to apply the proper rate of fumigant by using a meter located approximately 30 feet from the fumigant storage tank to keep track of the amount being pumped onto the grain. At least two persons were required to fumigate-one at the meter and another at the discharge point to apply fumigant to the silo, which could be located a long distance away. The employee watching the meter was supposed to keep a

record of the amount of fumigant used. Tr. at 79–80, 90 (Ellis).

30. The meter on the Max High Life storage tank malfunctioned and required service on more than one occasion. The person who ran the meter most of the time while Ellis was at the facility had an alcohol problem for many years and was finally fired after showing up drunk one day. Tr. at 109–10, 121 (Ellis).

31. Even though Ellis claimed to have kept inventory records of fumigant at the Scoular site, he never attempted to perform any estimates of the amount used during the 20–year period he was there, nor has anyone ever requested him to do so. He testified that the records were at the site when he left, but he did not know what happened to them and has never asked anybody for them. Tr. at 125–26.

32. Leo Gebhart was hired by Morrison in 1979 to replace Ellis. In May 1980, Morrison leased the elevator to Scoular, and Scoular employed Gebhart as general superintendent of the elevator. Tr. at 170, 171 (Gebhart). Gebhart remained in that position until the spring of 1995. During the time Gebhart was at the Scoular site, he never observed any spills or leaks of grain fumigant, was never advised of any spills of grain fumigant, never detected the smell of liquid grain fumigant in walking about the elevator premises, and never detected the presence of any liquid grain fumigant in the tunnels or around the outside of the storage buildings. Gebhart stated that if any amount of grain fumigant had leaked outside a silo, one would definitely know it. Tr. at 173, 175–76, 178.

33. Gebhart never made any effort to inspect the integrity of any of the structures at the facility to determine whether any fumigant was passing directly into the ground or into the groundwater. This was simply not an issue in his mind at the time. Tr. at 178.

34. The only way by which the employees determined that more Max High Life was needed was when the pump used to remove it from the storage tank "would pump dry." Tr. at 183 (Gebhart). The main reason Scoular kept inventory records was because the "state requires that you keep a record of where this fumigant goes." But Gebhart

doesn't think the state ever "came to look at those records while I was there." Tr. at 184.

35. Gebhart doesn't know what happened to the records Scoular kept of the amount of fumigant applied to the grain, has not asked anybody where they are, doesn't know if they are still in the storeroom at the plant, and has never tried to retrieve them himself. Tr. at 185.

36. McShares offered an inspection service to elevators for approximately 5–6 years during the early 1960s, and James Allen did the inspections of the Scoular site. The purpose of the inspection was to determine the extent of insect and rodent activity, not leakage of grain fumigant. Tr. at 568, 612, 614 (Allen). A normal inspection took most of a day or a full day, Allen inspected the grain elevator, the storage bins, the outside area around the buildings and storage facilities, the upright silos, and basically the entire elevator site. The inspections took place approximately nine times a year. Tr. at 575–77, 611 (Allen). It was Allen's judgment that the facility was not well kept or well maintained. However, during his inspections, Allen never observed any spill or leakage of grain fumigant, and did not smell any odors of grain fumigants (except for the single rat hole incident described in footnote 4, *supra*). Tr. at 577, 613.

37. McShares' experience in storing liquid grain fumigant in its own tanks indicated that 3–5% of the stored fumigant could evaporate and be released to the atmosphere each month. Tr. at 582 (Allen).

38. Small amounts of carbon tetrachloride were used by the Exline Corporation in their old shop building which is located west of the Scoular site. Exline employees dipped rags in carbon tetrachloride and used the rags to wipe off oil film from parts during the manufacturing process. This use occurred from the early 1960's until 1973–75 when Exline ceased using carbon tetrachloride. Tr. at 371, 378–79 (Exline). During that time, Exline never bought bulk quantities of carbon tetrachloride, and bought only one gallon cans. Tr. at 372 (Exline). There was no evidence that Exline improperly disposed of carbon tetrachloride.

*Discovery of Carbon Tetrachloride Contamination*

39. In 1988, the Kansas Department of Health and Environment (KDHE) tested residential water wells adjacent to the Scoular site and discovered the presence of carbon tetrachloride above the minimum action levels. Tr. at 27 (Bernhardt); Tr. at 496–98 (Morrison); Trial Ex. LL. One of the wells where the KDHE found carbon tetrachloride was at Bernhardt's residence, which is just across the railroad tracks to the northeast from the elevator. Tr. at 7, 26–27 (Bernhardt); Trial Ex. 2.

40. Carbon tetrachloride was also detected in the dewatering wells at the Scoular site in connection with Exline's remediation activities. Tr. at 374–75, 496. Morrison's dewatering wells were being used as a part of a treatment program previously instituted by Exline to remediate chromium contamination of the groundwater caused by Exline's operations, Tr. at 362–66, 369–71. Exline installed an air stripper at its facility to remove the carbon tetrachloride from the water being pumped from the dewatering wells. Tr. at 375–78.

41. There was no evidence that carbon tetrachloride had been used or spilled anywhere else in the vicinity of the water wells which were tested by KDHE and found to contain carbon tetrachloride contamination above minimum action levels.

42. Immediately after discovery of the carbon tetrachloride in the residential water wells, Morrison provided alternative drinking water to all area residents through rural water districts, and paid the initial cost of rural water installation together with future water bills for ten years. Tr. at 27 (Bernhardt), 499–501 (Morrison); Trial Ex. 76 (1988 Summary of Expenses).

*KDHE Involvement*

43. The KDHE issued an administrative order in 1989 requiring Morrison to conduct an investigation of the Scoular site, and Morrison, after initially appealing the administrative order, decided to conduct the investigation. Tr. at 505, 511 (Morrison); Trial Ex. 31. When it learned that KDHE was not going to look to McShares as a responsible party, Morrison made demand on McShares to participate in the costs of responding to the KDHE order. Tr. at 509, 527 (Morrison); Trial Exs. 21, 21A.

44. Kejr Science Group, Inc. (Kejr) was hired by Morrison to investigate the source and extent of carbon tetrachloride contamination at the Scoular site. Tr. at 391–92 (Shepard); Trial Ex. 20. Kejr provides environmental consulting services, including soil and groundwater investigation and remediation. Tr. at 386. Max Shepard was one of the principals of Kejr who was involved in the Scoular investigation. Tr. at 387–89. From 1989 through the time of trial, Kejr's activities at the Scoular site included: conducting a soil gas survey of 200 samples which were analyzed in the field using a gas chromatograph, Tr. at 397–99; installing an air stripper at the adjacent Exline facility, Tr. at 401–02, 405–06; taking and analyzing soil samples in 1991 and again in 1993, Tr. at 407–09, 420; conducting groundwater probing and testing, Tr. at 420–22; obtaining quality assurance/quality control reports, Tr. at 426; obtaining a lab analysis of soil content, Tr. at 430–31; making quarterly reports to KDHE, Tr. at 431; drilling of nine monitor wells and two recovery wells, Tr. at 432–33; conducting an aquifer test; and performing regular sampling and analysis of the wells, Tr. at 434.

45. Morrison entered into a Consent Order for Comprehensive Investigation and Corrective Action Study with the KDHE, Case No. 91–E–214, effective December 23, 1992 (Consent Order). Pretrial Order (Doc. 80 at 3); Trial Ex. 31. McShares was not a party to, and did not sign, the Consent Order. Pretrial Order (Doc. 80 at 3). Morrison's decision to enter into the Consent Order was influenced, to an extent, by his company's experience with an EPA-managed clean-up in Nebraska. Tr. at 539–42 (Morrison).

46. The Consent Order contained "boilerplate" provisions which describe the work to be performed and related activities to be undertaken by Morrison. It required quality assurance plans, gives the KDHE the right to approve or disapprove of activities or reports submitted by or on behalf of Morrison and requires that all work be performed

under the supervision of a professional engineer or geologist with expertise in hazardous waste investigation. Tr. at 206, 210–21 (Bean).

47. The findings contained in the Consent Order were the subject of negotiation between the KDHE and Morrison, Tr. at 301. They are not the result of a formal hearing where evidence was presented under oath and witnesses were subject to cross-examination, Tr. at 301.

48. It was the function of the KDHE to review and either approve or disapprove of the work performed by the engineer or consultant retained by Morrison under the Consent Order. The Order required the development of a Work Plan, which is to be followed by the Comprehensive Investigation Report ("CI") and a Corrective Action Study ("CAS"). When performing such reviews, the KDHE staff was required to utilize knowledge not possessed by a layman and necessary to form professional and scientific judgment with regard to what goes on at such sites and whether the requirements imposed by the KDHE have been satisfied. Tr. at 212, 213, 227, 286 (Bean).

49. Kejr prepared a Workplan on behalf of Morrison in response to the Consent Order. After review, comment and input from the KDHE, the Workplan was formally approved as contemplated by the Consent Order by the KDHE in its letter of May 13, 1993. Pretrial Order (Doc. 80 at 3).

50. Kejr also prepared Morrison's CI Report. After review, comment and input from the KDHE, the CI Report was formally approved as contemplated by the Consent Order by the KDHE in its letter of October 31, 1994. Pretrial Order (Doc. 80 at 3).

51. Finally, Kejr prepared Morrison's Corrective Action Study (CAS). After review, comment and input from the KDHE, the CAS was submitted to the KDHE by letter of June 25, 1996. By letter of June 17, 1997, as contemplated by the Consent Order, the KDHE conditionally approved the CAS, subject to clarification of seven identified points. Pretrial Order (Doc. 80 at 3). The CAS was finally approved by the KDHE in August 1997, and this ended Morrison's responsibilities under the Consent Order covering the Scoular site. Tr. at 515 (Morrison), 437 (Shepard).

52. Morrison funded the investigation of the Scoular site as required by the Consent Order. Tr. at 513–15 (Morrison); Trial Ex. 76. As of June 30, 1997, Morrison had paid $432,936.55 in response costs directly attributable to the Scoular site. Trial Ex. 76. All of the costs incurred by Morrison are reasonable and necessary response costs of the Scoular elevator site project. Tr. at 550–51 (Court).

53. Morrison has performed all activities required of it under the Consent Order with the KDHE. Tr. at 515 (Morrison).

### The Pilot Program Between KDHE and EPA

54. In October 1994, KDHE and the U.S. Environmental Protection Agency (EPA) entered into a Workplan for Cooperative Agreement which is known as the state deferral pilot program (Pilot Program). Tr. at 215–16 (Bean). There were later communications between EPA and KDHE about issues pertaining to the Pilot Program, including compliance with CERCLA and the National Consistency Plan. Trial Exs. 62 and 63. The Workplan for Cooperative Agreement was revised as of June 7, 1995, and was approved by the EPA by letter of July 25, 1995. Trial Exs. 64 and 65; Tr. at 310–11 (Bean). The final Workplan for Cooperative Agreement was modified to address the concerns raised in the letters between KDHE and EPA about the National Consistency Plan and other issues. Tr. at 310–11 (Bean).

55. The Pilot Program was intended to make the federal procedure applicable to sites within the program, to comply with the National Consistency Plan, and to give participants in the program assurance that the federal government would not come back on them if participants followed the KDHE comprehensive investigation and corrective action procedures. The Pilot Program was to be the functional equivalent of going through the federal Superfund process with the EPA. Tr. at 217, 308, 315–16 (Bean).

56. One purpose of the Pilot Program was to negotiate a division of responsibility between KDHE and EPA for sites not yet listed as Superfund sites whereby the state would take the lead and an expanded oversight responsibility for sites within the program. Trial Ex. 65 at 1. As part of the Pilot Program, EPA determined that KDHE's site investigation and cleanup process is consistent with the requirements of CERCLA and the National Consistency Plan, and KDHE agreed to recommend a CERCLA-protective cleanup for all state-lead sites under the Pilot Program. Trial Ex. 65 at 3.

57. In the Workplan for Cooperative Agreement, EPA defined its oversight responsibilities for the sites in the Pilot Program as consisting of the receipt of quarterly and annual reports from KDHE, semi-annual meetings between EPA and KDHE to review the program status and resolve potential problems, and the conduct by EPA of annual review of the pilot projects and review of any remedy selected by the State. Trial Ex. 65 at 3–4; Tr. at 219 (Bean). KDHE agreed to make available to EPA upon request, all remedy selection decision documents and supporting analysis pertaining to all sites included in the Pilot Program. Trial Ex. 65 at 5. If EPA determined that the state-lead cleanup process or remedial action was inadequate to achieve a CERCLA-protective cleanup, EPA retained the right to remove any site from the Pilot Program and have it processed for placement in the Superfund program. Trial Ex. 65 at 5.

58. The Scoular site was accepted into the Pilot Program in 1995. Trial Exs. 66, 69, 70, 71 and 72 (Exs. 70–72 received for limited purposes); Tr. at 241 (Bean), 328–32 (Elder).

59. KDHE submitted quarterly and annual reports to EPA concerning sites in the Pilot Program, which included the Scoular site. The purpose of the reports was to ensure that KDHE was complying with the Workplan. Tr. at 225–29 (Bean); Trial Ex. 68 at 9 (received for a limited purpose).

60. EPA has conducted program reviews of the Pilot Program, including an annual review at KDHE's offices on December 17, 1996. Tr. at 237 (Bean), 346 (Elder). EPA has never taken a site out of the Pilot Program for the purpose of exercising direct control over the site. Tr. at 238 (Bean).

61. KDHE has never received any complaints from EPA about how the Pilot Program is being implemented, and EPA has been complimentary of KDHE as to its handling of the pilot program. Tr. at 239, 251–52 (Bean) (testimony received for limited purpose).

62. EPA has never made any complaints to KDHE about KDHE's handling of the Scoular elevator site. Tr. at 239 (Bean).

*KDHE's Public Information Program*

63. In the Workplan for Cooperative Agreement, EPA and KDHE agreed that community relations activities at all sites in the Pilot Program would be conducted in accordance with KDHE's Public Information Program (PIP), and KDHE agreed to involve the affected community in the remedy selection process. The State agreed that its PIP is comparable to the procedures required by the National Consistency Plan and ensures early, effective and meaningful community involvement. Trial Ex. 65 at 4.

64. KDHE's PIP policy was in effect in 1993, and was to apply to KDHE-lead sites complying with the National Consistency Plan and for all sites being worked with the state cooperative program. Trial Ex. 73. Under the PIP policy, the KDHE project manager shall develop a written Public Relations Strategy not more than one page in length. Trial Ex. 73, ¶ A.

65. A PIP for the Scoular site was in place before the site was accepted into the pilot program in 1995. Tr. at 233–36, 240 (Bean). The Public Relations Strategy for the Scoular site was sent to Morrison for review and comment in December 1993 and was approved by the KDHE. Tr. at 236 (Bean); Trial Exs. 74, 75 (received for a limited purpose).

66. During the investigation stage, the KDHE PIP policy states that an announcement or news release should be published in a local newspaper declaring the Consent Order and initiation of field work for the CI/CAS, and any such news release must be approved by the KDHE project manager.

Trial Ex. 73, ¶ B(1). During the investigation stage, it is up to the KDHE to determine whether there was any need for any availability sessions with the public. Trial Ex. 73, ¶¶ B(2) & (3). When the Public Relations Strategy was sent to Morrison in December 1993 under the KDHE's 1993 PIP policy, no press release was issued about the consent order and no public availability sessions were held, because the Consent Order had already been in place for a year and the investigation was well underway. Tr. at 313 (Bean). When EPA accepted sites for inclusion in the Pilot Program in 1994–1995, including the Scoular site, EPA knew the status of the sites, whether there was a consent order in place, and whether a CI investigation was underway. Tr. at 323 (Bean).

67. The KDHE PIP policy states that after KDHE has prepared a Draft Corrective Action Decision (CAD), the KDHE shall conduct certain community relations activities, including publication of a news release or announcement, time for submission of comments on the Draft CAD, the opportunity for an availability session for public comment, preparation of a written summary of comments received during the public comment period, and publication of a summary of the Final CAD. Trial Ex. 73, ¶ C(1–5). The Public Relations Strategy adopted for the Scoular site provides for each of these activities, Trial Ex. 75, but the draft CAD has not been prepared by the KDHE and the time for performing these activities has not yet arrived. Tr. at 313 (Bean); Trial Ex. 74.

68. Morrison and its consultants have held meetings with the three individuals who owned homes or businesses immediately across the railroad tracks from the elevator (Bernhardt, Weber and O'Neal), and with other persons who owned land to the northeast of the elevator (Hilton, Morgan, Rosener, Allen and Madison). Morrison shared with them the test results of the water sampling, maps delineating the plume, information concerning the legal status of the project, and what the plans were for the site. Morrison had a policy of open disclosure of any information regarding the site. Tr. at 547–49 (Morrison).

*Conclusions of Fact and Law*

■ In a contribution action under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), Morrison first must make a prima facie showing that McShares is "liable or potentially liable" under Section 107(a), 42 U.S.C. § 9607(a). Thus, Morrison must prove that:

(A) the site is a facility as defined in § 9601(9);

(B) a release of a hazardous substance has occurred at the facility;

(C) McShares is a covered person under § 9607(a);

(D) the release caused Morrison to incur costs;

(E) Morrison's response actions were consistent with the National Contingency Plan (NCP); and

(F) Morrison's response costs were reasonable and necessary.

*Bancamerica Commercial Corp. v. Trinity Industries,* 900 F.Supp. 1427, 1451 (D.Kan. 1995) *(Bancamerica I ), aff'd in part, rev'd in part, sub nom. Bancamerica Commercial Corp. v. Mosher Steel,* 100 F.3d 792 (10th Cir.1996) *(Bancamerica II ); Greene v. Product Mfg. Corp.,* 842 F.Supp. 1321, 1323, 1325 (D.Kan.1993).

*Elements (A) and (B)*

The parties have stipulated that the Scoular site is a **facility** as defined in 42 U.S.C. § 9601(9). There is no dispute that carbon tetrachloride is **a hazardous substance** as defined in 42 U.S.C. § 9601(14) and 40 C.F.R. §§ 302.1 and 302.4 (1994). There is no question that a **release** of carbon tetrachloride occurred at the Scoular site as a result of the 1963 spill within the meaning of 42 U.S.C. § 9601(22). Thus, elements (A) and (B) have been proven.

*Element (C)*

The parties' first dispute concerns whether Morrison has proved element (C), that McShares is a "covered person" as defined by CERCLA. A covered person includes "the owner and operator of a ... facility." 42 U.S.C. § 9607(a)(1). A facility is defined to include any "motor vehicle ... where a

hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). The term "disposal" includes

> dumping, spilling, leaking, or placing of any ... hazardous waste into or on any land or water so that such ... hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. §§ 6903(3) & 9601(29). The term "ground waters" means "water in a saturated zone or stratum beneath the surface of land or water." 42 U.S.C. § 9601(12).

Morrison asserts that McShares is a "covered person" because the spill was from McShares' trailer, which was being operated by McShares' employee, and McShares owned the fumigant. (Doc 92 at 20). McShares denies liability on two bases (Doc. 98 at 2–4). First, it asserts that Ellis caused the 1963 spill by opening the valve before Bernhardt had connected the hose and started the pump. Next, McShares confusingly casts itself in the role of either a common carrier, or a supplier, but not both. Both parties rely on *Amcast Industrial Corp. v. Detrex Corp.,* 2 F.3d 746 (7th Cir.1993), *cert. denied,* 510 U.S. 1044, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994).

The pertinent conclusions of *Amcast* are summarized as follows:

> Each of the tanker trucks owned by Detrex in which it delivered TCE to Elkhart constituted prima facie a "facility" within the meaning of the Superfund law, § 9601(9)(A), contained a hazardous substance, namely TCE, and "disposed of" it when the truck spilled it, because the statute defines disposal to include spilling. §§ 6903(3), 9601(29).
>
> \* \* \* \* \* \*
>
> We conclude that Detrex was liable under the Superfund statute for the spillage from its own trucks (though it may be able to shift some of that liability back to Elkhart by means of its suit for contribution) but not the spillage from the trucks of the common carrier that it hired.

*Id.* at 750–51. McShares can be substituted for Detrex, Max High Life for TCE and Morrison for Elkhart. In this case, the sup-

plier itself, McShares, delivered the hazardous substance, Max High Life, on the only relevant "disposal," the 1963 spill.

The facts do not support McShares' argument that Morrison's manager, Eldred Ellis, caused the spill by opening the valve (Doc. 98 at 2–3). Rather, the court concludes that the spill occurred when Bernhardt, McShares' employee, was attempting to connect a hose owned by McShares to a trailer owned by McShares. The spilled carbon tetrachloride was owned by McShares. This is not a products liability case and Morrison was not required to prove the existence of a defect in the hose or trailer. Similarly, Morrison was not required to prove exactly what "caused" the spill. Morrison satisfied its burden by showing that the spill occurred when Bernhardt was doing something to McShares' trailer and that its employee, Ellis, did nothing to "cause" the spill. Accordingly, the court concludes that McShares is a "covered person" and that Morrison has proved element (C).

### Element (D)

The parties next dispute whether Morrison has proved element (D), that the release caused Morrison to incur response costs. 42 U.S.C. § 9607(a)(4)(B) makes a covered person liable for necessary response costs incurred by any other person consistent with the NCP. It is here that the court's orders regarding expert evidence first come into play. Morrison's position is that KDHE's discovery of carbon tetrachloride in the water wells immediately adjacent to the site of the 1963 spill in turn caused Morrison to incur response costs (Doc. 92 at 19). McShares responds that Morrison cannot meet its burden without resort to expert testimony (Doc. 93 at 36 ¶ 104 & Doc. 98 at 4–6).

The court discussed the "causation of response costs" issue in its December 18, 1996 Memorandum and Order (Doc. 72 at 9–16). Neither party sought reconsideration of the order, nor have they argued about the court's analysis in their trial briefs (Docs. 89 & 90) or their post-trial submissions. However, McShares has cited cases not discussed by the court, principally *Acushnet Co. v. Coa-*

*ters, Inc.,* 937 F.Supp. 988 (D.Mass.1996), for the proposition that Morrison must prove by expert evidence a causal connection between the waste discharged and the need for response costs (Doc. 98 at 5).

It is not necessary to recite *Acushnet's* facts. The court summarized the plaintiff's CERCLA recovery theory as follows:

> Under the form of legal test proposed by Plaintiffs, they do not need to prove that a toxic substance in NETT's waste (PAHs, for example) caused them to incur *response* costs. Instead, Plaintiffs assert that the only elements they must prove are:
>
> (1) that the [defendant] generator disposed of waste material; (2) at a facility which contains hazardous substances of the type found in the defendant's waste; (3) there is a release or a threatened release of that *or any* hazardous substance; (4) which triggers the incurrence of response costs.
>
> In other words, Plaintiffs assert that they do not need to prove any connection between any toxic substance in NETT's waste and the response costs being incurred by a plaintiff. Under Plaintiffs' legal theory, as long as any response costs are being incurred by a plaintiff, any party that disposed of any hazardous substance is liable to compensate that plaintiff. It does not matter what type or amount of hazardous substance was disposed of by the party. Any hazardous substance in any quantity will open the floodgates of liability, and will do so even if the hazardous substance disposed of by the party is not causing any harm, is not threatening to cause any harm, and is not any part of the reason a response is needed and costs of that response are incurred.

*Id.* at 993. The court rejected this far-out theory after giving it more consideration than it probably deserved. Morrison does not rely on *Acushnet.*

■ The causation element of a prima facie case does not require expert evidence, at least in this case. This is illustrated by *Dedham Water Co. v. Cumberland Farms Dairy,* 770 F.Supp. 41 (D.Mass.1991), *aff'd,* 972 F.2d 453 (1st Cir.1992), a case cited in *Acushnet* and by McShares. The facts are as follows: in 1974, Dedham Water Company

discovered heavy metal contamination in its water well fields. It commissioned an emergency study, which recommended, in 1980, the construction of a new water treatment plant. In 1981, the plaintiff discovered that similar contamination had been released on defendant's property. The plaintiff commissioned a hydrogeology study which concluded, in 1982, that defendant was the source of the contamination in plaintiff's well field. Plaintiff eventually constructed a new water treatment plant and then started a CERCLA action to recover from defendant the costs of building and operating the plant. When the case was tried, it was determined that the contamination was *not* "caused" by defendant. 689 F.Supp. 1223 (D.Mass.1988).

■ On appeal, the contamination "causation" finding was not challenged. However, the case was remanded for a determination of whether the treatment plant was built in response to a threat of release of contaminants from defendant's facility into plaintiff's well field. The court made it clear that it is not necessary to prove actual contamination in order to establish liability for response costs under 42 U.S.C. § 9607(a)(4)(B). 889 F.2d 1146, 1156 (1st Cir.1989).

On remand, the district court found as follows:

> I find that, at that point [1982], it was reasonable for the plaintiffs to believe that the VOCs had migrated from the defendant's facility to the well field and might continue to do so in the future. Even though it has now been judicially determined in the prior trial in this case that the offending VOCs were not released by the defendant, I find that there is a rather remote possibility (a "potential threat" to use Dr. Guswa's redundant expression) that VOCs from the defendant's facility might migrate to the plaintiffs' well field at some time in the future if geological conditions should change.
>
> As far as I can tell from this record, however, the response for which the plaintiffs seek reimbursement was not related to the "potential threat." The two-stage treatment plant recommended by Metcalf & Eddy in 1980 is substantially what was built. To be sure, the plant was not constructed until 1985, after the time when

the plaintiffs reasonably believed that the defendant's facility was the source of existing pollution and a threat of future pollution of the well field. Many of the necessary authorizing votes of the Board of Directors were taken after 1982, but they concerned regulatory delays, zoning problems and objections of abutters. The only action that appears to me to relate to the G. & M. report is the decision in 1982 to commence this action for damages.

770 F.Supp. at 42–43. Judgment was entered for defendant.

The plaintiff appealed. The second appellate opinion is long and contains big words which required this court to consult a dictionary to make sure that they had no real import in the decision.[13] The bottom line of the opinion affirming the district court is this: The actions of the plaintiff which lead to the response costs which the plaintiff sought to recover, i.e., the cost of building and operating the new plant, were not "caused" by anything done by the defendant because the plaintiff had decided to build the new plant *before* it received the 1982 hydrogeology report which (erroneously) blamed the contamination on the defendant.

So, in considering element (D)—whether the 1963 release caused Morrison to incur response costs—the focus is on what "caused" or motivated Morrison to take the action which resulted in the costs. Expert evidence is not required because, under the rationale of *Dedham,* it is irrelevant whether the party from whom the response costs are sought actually caused the contamination. Thus, it follows that it is irrelevant for purposes of element (D) whether Morrison can

prove, without expert testimony, that McShares actually "caused" the contamination. *See* Doc. 72 at 9–15.

The court finds that McShares, the person responsible for the 1963 spill, "somehow, or in some way" (*Dedham,* 972 F.2d at 460) "caused" Morrison to incur response costs. The fact that KDHE, not Morrison, discovered the contamination is immaterial. The undisputed fact of the 1963 spill justified Morrison's reasonable belief beginning at or near the outset of the KDHE 1988 discovery and 1989 administrative order that McShares was responsible for the contamination. This is evidenced by Morrison's early demand that McShares participate in the costs of responding to the KDHE order. McShares rejected the demand and Morrison funded the project, thereby incurring costs. The court concludes that Morrison has met its burden to prove element (D).

### Element (E)

Element (E) requires Morrison to prove that its response actions were consistent with the NCP. 42 U.S.C. § 9607(a)(4)(B). The parties' dispute regarding this element is multi-faceted. (Docs. 92 at 21–27 and 35–36; 93 at 36–38; 97 at 12–29; 98 at 6–16 and 101 at 1–12).

### 1985 Versus 1990 NCP

The first dispute concerns whether the 1985 NCP (40 CFR Part 300.71 (1988)) or the 1990 NCP (40 CFR Part 300.700 (1990)) is applicable. Morrison understandably argues for the 1990 version because it adopts a more lenient "substantial compliance" standard for a plaintiff seeking response costs.[14]

---

**13.** E.g., asseveration, embosom, amphiboly, apodictic and zoetic.

**14.** The 1985 version required strict compliance. The 1990 version provides, in pertinent part:

§ 300.700 **Activities by other persons.**

(a) *General.* Except as provided ..., any person may undertake a response action to reduce or eliminate a release of a hazardous substance, pollutant, or contaminant.

(b) *Summary of CERCLA authorities.* The mechanisms available to recover the costs of response actions under CERCLA are, in summary:

(1) Section 107(a), wherein any person may receive a court award of his or her response

costs, plus interest, from the party or parties found to be liable;

 \* \* \* \* \* \*

(c) *Section 107(a) cost recovery actions.*

 \* \* \* \* \* \*

(2) Responsible parties shall be liable for necessary costs of response actions to releases of hazardous substances incurred by any other person consistent with the NCP.

(3) For the purpose of cost recovery under section 107(a)(4)(B) of CERCLA:

(i) A private party response action will be considered "consistent with the NCP" if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this

The court views the discrete issue of which NCP version to apply as one of law, not fact. The evidence established that Morrison's response actions took place both before and after the 1990 change. When faced with the same situation, courts have taken sensible compromise approaches. For example, the court in *Tri–County Business Campus v. Clow Corp.*, 792 F.Supp. 984 (E.D.Pa. 1992), found that "if Tri–County's clean-up was 'underway' on April 9, 1990, the 1990 NCP is the applicable plan," at least to the extent that the 1990 plan does not impose new and more onerous requirements on private parties seeking recovery. *Id.* at 990 (citing *Con–Tech Sales v. Cockerham*, No. 87–5137, 1991 WL 209791 (E.D.Pa. Oct. 9, 1991)). In a later case from the same court, a different judge observed:

> Since CERCLA's passage in 1980, the EPA has issued three versions of the NCP—the 1982 NCP, the 1985 NCP and the 1990 NCP. Courts evaluate response costs incurred by referring to the NCP in effect at the time the costs were incurred. *Reading Co. v. City of Philadelphia*, 823 F.Supp. 1218, 1239 (E.D.Pa.1993); *Con–Tech Sales Defined Benefit Trust v. Cockerham*, Civ. A. No. 87–5137, 1991 WL 209791, at *3 (E.D.Pa. Oct. 9, 1991). In comments to the 1990 NCP, the EPA stated that "although some people have expressed the opinion that the new NCP should not apply to private response actions initiated prior to the effective date of the revised NCP ... EPA does not believe that it is appropriate to grandfather clean-ups that are already underway." 55 Fed. Reg. 8795 (March 8, 1990). The 1990 NCP became effective on April 9, 1990. Thus, the court will apply the requirements of the 1990 NCP to costs incurred after April 9, 1990, or any response actions already underway as of April 9, 1990. The requirements of the 1985 NCP will apply to any cleanups complete prior to April 9, 1990.

*Bethlehem Iron Works, Inc. v. Lewis Industries, Inc.*, No. 94–0752, 1996 WL 557592, at

*54 (E.D.Pa. Oct. 1, 1996). McShares does not cite a case, and the court has not found one, which holds that only the 1985 or 1990 versions of the NCP must be applied when response costs were incurred both prior to and after 1990. The court finds *Bethlehem Iron Works* persuasive and will follow it.

### Removal Versus Remedial

The second dispute concerns whether Morrison's response actions were "removal" or "remedial." The distinction is important because the requirements for NCP compliance are different, depending on how the response action is characterized. McShares asserts that expert testimony is required on this issue (Doc. 98 at 7–8 n. 2 and 12–13).

Morrison argues that its actions to date have been "removal" in nature (Doc. 92 at 21–27). Citing *Channel Master Satellite v. JFD Electronics Corp.*, 748 F.Supp. 373, 386 (E.D.N.C.1990), Morrison contends that the proper classification of a cleanup as "removal" or "remedial" is an issue of law not appropriate for expert testimony. Courts have followed *Channel Master* in this regard. *See Yellow Freight System, Inc. v. ACF Industries, Inc.*, 909 F.Supp. 1290, 1299–1300 (E.D.Mo.1995) and *Hatco Corp. v. W.R. Grace & Co.*, 849 F.Supp. 931, 962 (D.N.J. 1994). These cases focus on the general rule that expert testimony cannot be used to define the legal parameters under which a *jury* exercises its fact-finding function. *Specht v. Jensen*, 853 F.2d 805, 809–10 (10th Cir.1988), *cert. denied*, 488 U.S. 1008, 109 S.Ct. 792, 102 L.Ed.2d 783 (1989). This general rule loses its force when applied to a case, such as this one, which is tried to the court. In a bench trial, the court is presumed capable of separating its fact-finding function from its obligation to interpret and apply the law. Thus, the question is not whether expert testimony is *required* to resolve the issue. Rather, the question is whether the non-expert evidence in the record is sufficient for the court to reach a legal conclusion whether Morrison's actions were "removal" or "remedial."

> section, and results in a CERCLA-quality clean-up; and
>
> \* \* \* \* \* \*
>
> (4) Actions under § 300.700(c)(1) will not be considered "inconsistent with the NCP," and

> actions under § 300.700(c)(2) will not be considered not "consistent with the NCP," based on immaterial or insubstantial deviations from the provisions of 40 CFR part 300. (Emphasis supplied.)

As a preliminary matter, the court is aware of the Tenth Circuit's ruling in *Bancamerica Commercial v. Mosher Steel of Kansas*, 100 F.3d 792, 797–98 (1996) that a determination of "removal" versus "remedial" is "irrelevant" when response actions are taken pursuant to 40 C.F.R. § 300.700(c)(3)(ii)(1995). Subsection (c)(3)(ii) provides that any response action carried out in compliance with the terms of an order issued by EPA pursuant to 42 U.S.C. § 9606 or consent decree pursuant to 42 U.S.C.

§ 9622 will be considered "consistent with the NCP;" this is sometimes called the irrebuttable presumption of compliance. Morrison acknowledges that its actions in accordance with the KDHE's requirements do not entitle it to claim the irrebuttable presumption (Doc. 92 at 27 ¶ 20). Therefore, the court must decide whether Morrison has shown its actions were "removal" in nature.

 The terms "removal" and "remedial" are defined by CERCLA [15] and the NCP.[16] The courts generally consider that "a remov-

15. (23) The terms "remove" or "removal" mean the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. S 5121 et seq.].

(24) The terms "remedy" or "remedial action" mean those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of

hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

16. 40 C.F.R. 300.5 proves, in pertinent part:
*Remedy or remedial action* (RA) means those actions consistent with permanent remedy taken instead of, or in addition to, removal action in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, on-site treatment or incineration, provision of alternative water supplies, any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment and, where appropriate, post-removal site control activities. The term includes the costs of permanent relocation of residents and businesses and community facilities (including the cost of providing "alternative land of equivalent value" to an Indian tribe pursuant to CERCLA section 126(b)) where EPA determines that, alone or in combination with other measures, such relocation is more cost-effective than, and environmentally preferable to, the transportation, storage, treatment, destruction, or secure disposition off-site of such hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes off-site transport and off-site storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials. For the purpose of the NCP, the term also includes enforcement activities related thereto.

al is a short-term limited response to a more manageable problem, while a remedial action involves a longer term, more permanent and expensive solution to a more complex problem." *Bancamerica, supra* at 797, citing *Tri–County Business Campus Joint Venture v. Clow Corp.*

While the "removal" versus "remedial" issue may be legal in nature, it cannot be decided in a factual vacuum. Morrison points to the following as evidence of a "removal" action:

A. The activities encompassed by the KDHE-approved CI Report and attached Scope of Work comply with the monitoring, assessment and evaluation requirements of 42 U.S.C. § 9601(23). Morrison asserts that the costs incurred for investigation and testing for groundwater contamination constitute a removal action, citing this court's decision in *Greene v. Product Mfg. Corp.*, 842 F.Supp. 1321, 1324 n. 6 (1993) (Doc. 92 at 22–23). The problem with reliance on *Greene*, and the reason why it offers slight guidance, is that under a March 1993 consent order with the KDHE, Greene agreed to carry out a *removal* action. Thus the court was not required to decide the "removal" versus "remedial" issue. The Consent Order (Trial Ex. 31) does not contain such an agreement.

B. It is undisputed that immediately after the carbon tetrachloride was discovered in water wells in 1988, Morrison provided and paid for rural water service to the parties whose wells were contaminated and agreed to pay water bills for ten years. Morrison points out that the "provision of alternative water supplies" is a removal element described in 42 U.S.C. § 9601(23) (Doc. 92 at 23).

C. Apparently there has been no decision or implementation of a "permanent remedy" for the Scoular site. Morrison argues, in essence, that if no permanent remedy has been arrived at for purposes of 42 U.S.C. § 9601(24), then the action taken must be "removal" as contemplated by § 9601(23). (Doc. 92 at 23–24).

D. Morrison points to the fact that it has done everything required of it by the KDHE which, in turn, has operated under the Pilot Program with the EPA's approval, again citing *Greene v. Product Mfg. Corp.* for the proposition that the provisions of a consent decree with KDHE are sufficient to satisfy the requirements in a removal action. (Doc. 92 at 24–27). Once again, *Greene* is unhelpful because the court was not called upon to decide the "removal" versus "remedial" issue. Its comment that the provision of the consent degree providing for a community relations program through KDHE is sufficient to satisfy the NCP really has nothing to do with the "removal" versus "remedial" issue. 842 F.Supp. at 1326.

The court will assume, for purposes of discussion, that the 1990 NCP is applicable to Morrison's 1990–to–date responses. Because Morrison is taking the position that its response actions [17] have been removal in na-

---

*Remove or removal . . . .* For the purpose of the NCP, the term also includes monitoring of action to remove a discharge. As defined by section 101(23) of CERCLA, remove or removal means the cleanup or removal of released hazardous substances from the environment; such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment; such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances; the disposal of removed material; or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare of the United States or to the environment, which may otherwise result from a release or threat of release. The term includes, in addi-

tion, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 104(b) of CERCLA, post-removal site control, where appropriate, and any emergency assistance which may be provided under the Disaster Relief Act of 1974. For the purpose of the NCP, the term also includes enforcement activities related thereto.

**17.** 40 C.F.R. § 300.5 provides:

*Respond or response* as defined by section 101(25) of CERCLA, means remove, removal, remedy, or remedial action, including enforcement activities relating thereto.

ture, it is obliged to prove that its actions have been in "substantial compliance" with those portions of the NCP which pertain to removal actions. 40 CFR § 300.700(c)(5), refers to other regulations as "potentially applicable to private party actions." Some, but not all, of the regulations are sections 300.410 (removal site evaluation), 300.415 (removal actions), 300.420 (remedial site evaluation), 300.430 (remedial investigation/feasibility study and selection of remedy) and 300.435 (remedial design/remedial action, operator and maintenance). Each section contains extensive, detailed descriptions of procedures, actions to be taken, goals and principles which either may or must be complied with. Those pertaining to removal actions (§ 300.410 and 415) consume five pages of CFR. It is both helpful and appropriate to refer to these sections to determine whether Morrison's evidence has presented demonstrated a "removal action."

Section 300.410 speaks to a "preliminary assessment" as part of a removal site evaluation. It provides, in pertinent part:

(a) A removal site evaluation includes a removal preliminary assessment and, if warranted, a removal site inspection.

(b) A removal site evaluation of a release identified for possible CERCLA response pursuant to § 300.415 shall, as appropriate, be undertaken by the lead agency [18] as promptly as possible. The lead agency may perform a removal preliminary assessment in response to petitions submitted by a person who is, or may be, affected by a release of a hazardous substance, pollutant, or contaminant pursuant to § 300.420(b)(5).

(c)(1) The lead agency shall, as appropriate, base the removal preliminary assessment on readily available information. A removal preliminary assessment may include, but is not limited to:

(i) Identification of the source and nature of the release or threat of release;

(ii) Evaluation by ATSDR or by other sources, for example, state public health agencies, of the threat to public health;

(iii) Evaluation of the magnitude of the threat;

(iv) Evaluation of factors necessary to make the determination of whether a removal is necessary; and

(v) Determination of whether a nonfederal party is undertaking proper response.

■ Under the regulations, KDHE was not required to do a preliminary assessment. However, if it opted to do one, then Morrison's burden is to show that the preliminary assessment was in "substantial compliance" with the NCP. The evidence from KDHE lay witnesses Bean and Elder [19] was that KDHE did a preliminary assessment in April 1991, that it is customary for preliminary assessments to be reduced to a written document and that no document reflecting the preliminary assessment could be found in KDHE files. (Tr. at 303–306 and 339–45). The court finds that this evidence is marginally sufficient to show a preliminary assessment was done. It clearly is *not* sufficient to show that the assessment was in "substantial compliance" with NCP. Without a written report, the court cannot determine whether the assessment complied with section 300.410 which deals with removal site evaluation. The inability to make that determination, in turn, has a severe negative impact upon Morrison's ability to show that its responses were "removal" in nature.

Further analysis is not required. While certain of Morrison's actions are consistent with "removal"—e.g., provision of rural water—the evidence as a whole is insufficient to demonstrate that the entirety of Morrison's actions amount to "removal." It is here that expert evidence would be necessary for the court to evaluate whether Morrison's response actions were sufficient to meet the requirements of the NCP. In the absence of such evidence, Morrison cannot demonstrate that its response actions were consistent with the NCP, element (E) of its prima facie showing.

*Public Comment*

Although not strictly necessary at this point, the court will address the parties' third

---

**18.** "Lead agency" is defined in § 300.5. For purposes of this case, it would appear to be KDHE.

**19.** Morrison did not offer Elder and Bean as Rule 702 witnesses.

NCP compliance dispute: whether Morrison has satisfied the opportunity for "public comment" requirement of the NCP which is set forth in § 300.700(c)(6), as follows:

(6) Private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action based on the provisions set out below, or based on substantially equivalent state and local requirements. The following provisions of this part regarding public participation are potentially applicable to private party response actions, with the exception of administrative record and information repository requirements stated therein:

(i) Section 300.155 (on public information and community relations);

(ii) Section 300.415(n) (on community relations during removal actions);

(iii) Section 300.430(c) (on community relations during RI/FS) except paragraph (c)(5);

(iv) Section 300.430(f)(2), (3), and (6) (on community relations during selection of remedy); and

(v) Section 300.435(c) (on community relations during RD/RA and operation and maintenance).

Proceeding on the basis that its response actions have been "removal" in nature and governed by the 1990 NCP, Morrison contends that its active cooperation with the KDHE satisfied the public comment requirements of the 1990 NCP. *General Electric Co. v. Litton Business Systems, Inc.,* 715 F.Supp. 949, 961 (W.D.Mo.1989), *aff'd,* 920 F.2d 1415 (8th Cir.1990) and *American Color & Chemical v. Tenneco Polymers,* 918 F.Supp. 945, 956–57 (D.S.C.1995) (Doc. 97 at 15–17).

There was no specific provision in the 1985 NCP for public notice and comment before a private party could undertake a removal action. *VME Americas, Inc. v. Hein–Werner Corp.,* 946 F.Supp. 683, 690 (E.D.Wis.1996) (citing *Con–Tech Sales Defined Benefit Trust v. Cockerham,* 1991 WL 209791, at *8).[20] The 1990 NCP addressed the matter in Section 300.415(n) which provides, in pertinent part:

*Community relations in removal actions.* (1) In the case of all CERCLA removal actions taken pursuant to § 300.415 or CERCLA enforcement actions to compel removal response, a spokesperson shall be designated by the lead agency. The spokesperson shall inform the community of actions taken, respond to inquiries, and provide information concerning the release. All news releases or statements made by participating agencies shall be coordinated with the OSC/RPM. The spokesperson shall notify, at a minimum, immediately affected citizens, state and local officials, and, when appropriate, civil defense or emergency management agencies.

The regulation places additional requirements on the "lead agency" depending on the duration of the removal activity.

As previously noted, KDHE assumed the role of "lead agency" in this matter. According to the Consent Order (Trial Ex. 31), KDHE determined that there was a "need for a response action" (*id.* ¶ 29) and ordered an investigation and preparation of a Work Plan, which was to address specific areas (*id.* ¶ 30 and 33). The Consent Order has no specific provisions or requirements for public comment. It does contain a section requiring that all actions taken pursuant to the order be "in accordance with the substantive requirements of all applicable federal laws and regulations" (*id.* ¶ 58). The Consent Order was signed in December 1992, well after the effective date of the 1990 NCP.

The Work Plan was prepared and submitted to KDHE in October 1992 (Trial Ex. 32). In a January 1993 letter to Roger Morrison, KDHE commented on the Work Plan (Trial Ex. 33). The letter states, in pertinent part:

22. Community Relations Plan. KDHE will not require that a community relations plan be conducted for this CI/CAS.[21] However, KDHE will assist in, and cooperate in community relations activities which

---

**20.** The 1985 NCP did provide for "an opportunity for appropriate public comment concerning the selection of a remedial action ..." in certain circumstances. 40 C.F.R. § 300.71(a)(2)(ii)(D).

**21.** Comprehensive Investigation/Corrective Action Study, revised April 1993 (Trial Ex. 39).

we all agree are appropriate during this process.

Kejr Science Group, Inc. responded on behalf of Morrison. Its March 1, 1993 letter acknowledged that: "KSGI will not prepare a community relation plan as part of the CI/CAS." (Trial Ex. 34 at 11 ¶ 22). The CI and the CAS were approved by KDHE on March 31, 1995, and August 6, 1997, respectively. (Trial Exs. 52 and 61B).

The term "community relations plan" appears to be derived from Section 300.415(n). A similar term, "community relations activities," appears in the so-called June 1995 Workplan for a Cooperative Agreement between KDHE and EPA which provides, in pertinent part:

> NATIONAL PROGRAM CONSISTENCY
> All activities conducted under this Cooperative Agreement will be consistent with CERCLA, as amended by SARA, and the National Contingency Plan ("NCP") dated March 8, 1990 (Federal Register, Vol. 55, No. 46). NCP, 40 CFR Part 300. EPA has determined that KDH & E's site investigation and cleanup process is consistent with the requirements of CERCLA and the NCP. KDHE agrees to recommend a CERCLA-protective cleanup remedy based upon the administrative record and state decision document for all statelead sites covered under this Agreement.

> * * * * * *

> PUBLIC PARTICIPATION ACTIVITIES
> KDH & E and EPA agree that community relations activities at all sites funded under this Agreement will be conducted in accordance with KDH & E's Public Information Program: Policy RS 93–003. KDH & E will determine that there are no significant objections from the affected community to a State-lead SACM response and agrees to fully involve the affected community in the remedy selection process. While the State does not have to meet the community relations requirements in the NCP, the State agrees that the State's Public Information Program is comparable to the procedures required by the NCP and ensures early, effective and meaningful community involvement.

(Trial Ex. 65). The Scoular site was accepted into the program governed by the Workplan in May 1995 (Trial Ex. 70).

Thus, based upon the Consent Order, Work Plan, CI/CAS and Cooperative Agreement line of progression, KDHE agreed with EPA to institute community relations activities comparable to CERCLA and the NCP but, at the same time, agreed with Morrison that no community relations plan would be conducted for the CI/CAS. Rather, KDHE agreed with Morrison that it "will assist in and cooperate in community relations activities which we all agree are appropriate during this process." Such "agreement," if there was one, seems to have been expressed in KDHE's December 3, 1993 letter to Roger Morrison which enclosed a draft Public Relations Strategy for the Scoular site (Trial Exs. 74 and 75). The draft proposes a public relations strategy for the Scoular site for planning and implementing a Public Information Program or PIP (Trial Ex. 73). Both the draft Public Relations Strategy and the Public Information Program specifically provide that KDHE will be responsible for Public Information Program activities and procedures. KDHE has yet to implement the procedures set forth in the Public Relations Strategy.

McShares has cited cases standing for the proposition that state agency participation in private party response actions cannot serve as a substitute for NCP public participation requirements (Doc. 98 at 15–16). The most recent case is *VME Americas, Inc. v. Hein–Werner Corp.,* 946 F.Supp. 683 (E.D.Wis. 1996). The court rejected VME's argument that its "contacts" with the Wisconsin Department of Natural Resources amounted to an acceptable substitute for public involvement, noting that "nothing approaches the 'active involvement' of the state agencies involved in *General Electric* and *American Color." Id.* at 692.

A later case not cited by McShares is *Union Pacific Railroad Co. v. Reilly Industries,* 981 F.Supp. 1229 (D.Minn.1997). The Minnesota Pollution Control Agency (MCPA) conducted two public hearings with respect to the contamination site. Nevertheless, the court granted defendant's motion for sum-

mary judgment, rejecting Union Pacific's argument that it had substantially complied with the NCP by meeting the requirements of Minnesota's Voluntary Investigation and Cleanup (VIC) Program. The court found that Union Pacific's final remedial action plan had been verbally approved by the MCPA and much work already had been done before the meetings were held. It concluded that "the public was informed of the selection without a reasonable opportunity for discussion. Contrary to plaintiff's assertions, this record does not support a determination that the remedial alternatives were a subject for any meaningful public debate. Thus, on the basis of plaintiff's failure to provide for public comment, Union Pacific is not in substantive compliance of the NCP." *Id.* at 1237.

The court finds both *VME* and *Union Pacific* to be factually distinguishable. Unlike *VME*, Morrison's contacts with KDHE amounted to "active involvement" of KDHE. The record is full of detailed correspondence between KDHE and Morrison/Kejr regarding the Workplan and CI/CAS. There are no facts in either *VME* or *Union Pacific* which remotely suggest that either PRP was specifically told by its respective KDHE counterpart that a community relations plan would *not* be required for purposes of the equivalent CI/CAS (assuming there were equivalents). In neither case did the state enforcement agency specifically agree with the PRP that the *agency* would initiate and conduct public participation activities.

 The court concludes, without the necessity for presentation of expert evidence, that Morrison's actions have met the public comment requirements of the NCP, whether the requirement for such compliance is considered to be specific or merely substantial and without regard to whether Morrison's actions are "removal" or "remedial." Morrison agreed to follow KDHE which, in turn, agreed to follow CERCLA and NCP. KDHE never informed Morrison that it had an independent obligation under CERCLA and the NCP to initiate some sort of public comment program. On the contrary, KDHE expressly dictated the terms of any required public comment program and Morrison complied. In doing so, Morrison was entitled to assume that such compliance would meet its public comment obligations under CERCLA and the NCP. To hold otherwise would destroy any incentive for a PRP like Morrison to voluntarily cooperate with and follow the directions of state enforcement authorities, one of the goals of CERCLA. *American Color & Chem. v. Tenneco Polymers,* 918 F.Supp. at 955. It would place a PRP in the untenable position of deciding to voluntarily cooperate with state enforcement authorities with no assurance that its cooperation will satisfy CERCLA and NCP requirements, even when operating under a Pilot Program and Workplan for Cooperative Agreement, such as here, where it was clearly understood that the KDHE was acting, in practical effect, for the EPA, with minimal EPA oversight. Morrison was not merely consulting KDHE or seeking occasional advice. It was operating under a Consent Order and various plans approved by KDHE. It would be totally unreasonable to place Morrison in the "Catch 22" position of complying with KDHE, on one hand, while, on the other, having to second-guess or oversee KDHE's requirements to make sure that KDHE was complying with CERCLA and the NCP.[22]

Accordingly, the court finds that Morrison has met the public comment requirement of the NCP.

*Element (F)*

The court adheres to its finding at trial that Morrison has met its burden to show that its response costs were reasonable and necessary. The court accepts Roger Morrison's unchallenged testimony that he carefully monitored the response costs and made sure that they were segregated from other

---

**22.** Throughout the preparation of his decision, the court has been forced to confront the complex requirements of CERCLA and the NCP. The court wonders how a PRP reasonably can be expected to understand and comply with all the requirements when it is on the front line, so to speak, trying to effect some sort of "CERCLA quality" cleanup. The Third Circuit expressed the problem as follow:

> CERCLA is not a paradigm of clarity or precision. It has been criticized frequently for inartful drafting and numerous ambiguities attributable to its precipitous passage. Problems of interpretation have arisen from the Act's use of inadequately defined terms, a difficulty particularly apparent in the response costs area. *Artesian Water Company v. Government of New Castle County,* 851 F.2d 643, 648 (3rd Cir.1988).

expenses of Morrison Enterprises. (Tr. at 516–24). However, because Morrison has not demonstrated that its responses were consistent with the NCP, the court cannot find that the costs also were consistent with the NCP, assuming such a showing is required in a § 113(f) action.

*Recovery Notwithstanding Noncompliance*

Morrison contends that its "investigative and monitoring costs" are recoverable without a showing of consistency with the NCP (Doc. 98 at 17–19). This contention is not mentioned in the Pretrial Order, but the court will consider it anyway.

It is appropriate to recall that this is an action for contribution under Section 113(f) of CERCLA. Morrison seeks recovery of its response costs. Pretrial Order, Doc. 80 at 1–2. Morrison also pled state law contribution claims but has since taken the position that such claims are moot (Doc. 92 at 36–37). Thus, the only basis for this court's jurisdiction is CERCLA. Morrison's position throughout has been that the response costs it seeks to recover have been incurred as part of a removal action, not a remedial action, as those terms are utilized in CERCLA, the NCP and case law.

Under *County Line Investment Company v. Tinney, supra,* 933 F.2d 1508 (10th Cir. 1991), the Tenth Circuit clearly held that "Proof of response costs incurred 'consistent with' the NCP is, therefore an element of a prima facie private-cost recovery action under CERCLA." 933 F.2d at 1512. The court went on to observe that in a § 113(f) action such as this,

> The New Owners have not asserted that Tinney is jointly liable with them under any law other than CERCLA's section 107(a). Thus, in the context of this case, the only discernible "liability" referenced in section 113(f) is the common liability created by CERCLA section 107. Section 107 only imposes joint and several liability

on potentially liable parties, such as Tinney and the New Owners, to the extent there are "necessary costs of response" incurred by private parties "consistent with the national contingency plan" or governmentally-incurred response costs that are "not inconsistent" with the NCP. 42 U.S.C. S 9607(a)(4)(B). If no costs qualifying under this language have been incurred by or awarded against the party seeking contribution, then there is no common liability and no right to contribution under CERCLA section 113(f). Hence, absent a showing that appellants' response costs were incurred consistent with the NCP, no right to contribution for these costs exists under CERCLA.

*Id.* at 1516 (footnote omitted).

A fair rewording of the last sentence would seem to be that there is no right under CERCLA to recover response costs which were incurred *inconsistent* with the NCP.[23] Nevertheless, Morrison cites one case in which a former judge in this district agreed with the line of cases holding that costs of initial investigation and monitoring of a hazardous waste release are recoverable, even without a showing of compliance with NCP. *A.S.I., Inc. v. Sanders,* No. 92–1209–PFK, 1996 WL 91626, at *6 (Feb. 9, 1996) (citing additional cases).[24] The judge noted that the Tenth Circuit was presented with the issue in *Tinney* but declined to resolve it because the issue had not been presented to the district court.

 This court is not in the business of predicting how the Tenth Circuit may rule on an issue. Rather, this court's job is to try to apply and follow what the Tenth Circuit has said. In this case, the language in *Tinney* seems pretty clear: "absent a showing that appellant's response costs were incurred consistent with the NCP, no right of contribution for these costs exists under CERCLA." Since neither CERCLA nor the NCP expressly or impliedly define, distinguish or

---

**23.** "Investigative and monitoring costs," the term used by Morrison, is not specifically defined in CERCLA. 42 U.S.C. § 9601(23) uses the words "monitor, assess and evaluate the release" in defining "removal" but it also uses the word "monitoring" in connection with the definition of "remedial" in § 9601(24). The word "monitoring" is used in the NCP definitions of remedy or

remedial action *and* remove or removal, 40 CFR § 300.5. Neither CERCLA nor the NCP list a type or category of response costs which are recoverable without a showing of consistency with the NCP.

**24.** The case was settled shortly after the order was issued.

exempt "investigative and monitoring costs" from response costs, this court declines to create such a distinction by judicial construction. The court recognizes that this is contrary to *A.S.I., Inc,* and cases cited therein, but the court is unable, after studying those cases, to reconcile them with *Tinney.* Rather, this court is persuaded by the reasoning expressed in *Angus Chemical Company v. Mallinckrodt Group, Inc.,* No. 3:95–295, 1997 WL 280740 (W.D.La. Mar. 4, 1997), and will refrain from an interpretation of CERCLA and the NCP which is contrary to both their plain language, as well as the language of *Tinney.*

### Conclusion

In conclusion, the court finds that Morrison has met its burden to prove elements (A)—(D) and two components of element (E) of its prima facie showing. However, Morrison has not met its burden to show whether its response actions were "removal" or "remedial" under the NCP and hence that its actions complied with the requirements of the NCP. Therefore, the court finds that Morrison has not fully met its burden to prove elements (E) and (F). Accordingly, because Morrison has not fully satisfied its prima facie showing, judgment shall be entered for McShares on Morrison's claim under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f).

The clerk is directed to enter judgment for McShares pursuant to Fed.R.Civ.P. 58.

IT IS SO ORDERED.

ATTACHMENT

ATTACHMENT

---

DEFENDANT'S EXHIBIT
94-1219-MLB

***SUPPLEMENTAL DECISION***

Before the court are the following:

1. Morrison's motion to alter and amend judgment (Doc. 106);

2. McShares' response (Doc. 109); and

3. Morrison's reply (Doc. 110).

*Declaratory Judgment*

Morrison correctly notes that in its May 1 Memorandum Decision (Doc. 104), this court

neglected to rule on Morrison's claim for a declaratory judgment concerning liability for future response costs. Morrison cites 42 U.S.C. § 9613(g)(2) which states, in part:

In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs ... that will be binding upon any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the ... facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

Morrison contends that a declaration of McShares' liability for future response costs is both mandatory and not precluded by the court's decision denying Morrison's claim for past response costs. *Foster v. United States,* 922 F.Supp. 663, 664 (D.D.C.1996) (unfavorable judgment on a claim for past cleanup costs does not, under the facts presented, preclude declaratory relief to fix liability for future costs).

McShares responds that because Morrison's claim is one for contribution, Morrison is not entitled to declaratory relief. McShares principally relies upon *Sun Company, Inc. v. Browning–Ferris, Inc.,* 919 F.Supp. 1523 (N.D.Okla.1996), *rev'd in part on other grounds,* 124 F.3d 1187 (10th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1045, 140 L.Ed.2d 110 (1998). District Judge Kern did rule, without discussion, that "since this Court has determined that Plaintiffs are limited to a section 113 contribution action, they are not entitled to a declaratory judgment under section 113(g)(2)." Significantly, however, he went on to rule that plaintiffs were entitled to pursue declaratory relief under 28 U.S.C. § 2201(a).[1] Nevertheless, he declined to enter a declaratory judgment regarding apportionment of response costs, citing "uncertainty as to the amount of response costs incurred within the limitations period, and the amount likely to be incurred

in the future ...." He reserved ruling on the request for declaratory relief pending receipt of supplemental briefs detailing costs likely to be incurred in the future. *Id.* at 1532–34.

When the case reached the Court of Appeals, the court noted that the additional briefing ordered by Judge Kern had been abated pending outcome of the appeal. Therefore, the court did not decide whether Judge Kern was correct in ruling that CERCLA declaratory relief is unavailable to a contribution plaintiff. However, at least by implication, if not specifically, the court rejected the distinction between section 107 and 113 claims upon which McShares relies. The court observed:

As we made clear in *Bancamerica Commercial,* § 113(f) did not create a new cause of action, nor did it create any new liabilities. It is no more than a mechanism for apportioning CERCLA-defined costs. Thus, of necessity it must incorporate the liabilities set forth in § 107(a), as those are costs to be equitably apportioned.... It is thus clear that because § 113(f) incorporates the liability provisions of § 107, ... a § 113(f) action for contribution is an action under § 107.

*Id.* at 1191 (internal quotations, citations and footnote omitted). Therefore, this court concludes that McShares is entitled to seek declaratory relief under section 113(g)(2). A contrary conclusion would seem illogical.

Section 113(g)(2) obligates the court to enter a declaratory judgment on liability for response costs that will be binding on any subsequent action to recover further response costs. The logical purpose of this provision is to minimize or eliminate the expenditure of resources required to relitigate the case each time new response costs are incurred. *Boeing Co. v. Cascade Corp.,* 920 F.Supp. 1121, 1140–41 (D.Or.1996). *See also Kelley v. E.I. DuPont de Nemours and Co.,* 17 F.3d 836, 844 (6th Cir.1994) ("In providing for the recovery of response costs, Congress included language to insure that a responsible party's liability, once established, would not have to relitigated.") A judgment as to liability for recoverable costs does not pre-

---

1. Morrison did not seek declaratory relief under 28 U.S.C. § 2201. (Pretrial Order, Doc. 80).

clude a defendant from challenging, at a later time, that certain named response costs are inconsistent with the National Contingency Plan. *Kelley v. Thomas Solvent Co.,* 727 F.Supp. 1532, 1551 (W.D.Mich.1989).

There is no question that a justiciable case or controversy exists and will continue to exist between Morrison and McShares regarding McShares' liability for cleanup costs related to the 1963 spill of carbon tetrachloride. In its Memorandum Decision, the court resolved in Morrison's favor elements A–D of Morrison's prima facie showing. (Doc. 104 at 29–36). The court finds that Morrison now is entitled to a declaratory judgment in its favor on elements A–D. The court resolved elements E and F (whether Morrison's response actions were consistent with the National Contingency Plan and whether Morrison's response costs were reasonable and necessary) against Morrison because of its prior rulings denying Morrison the use of expert evidence. *Id.* at 36–57. This ruling, however, was restricted to past response costs. In the event of a subsequent action or actions to recover future response costs, Morrison will not be similarly precluded from attempting to prove elements E and F and allocation of its costs because the court will exercise its discretion and allow Morrison to utilize expert evidence.

### State Law Claims

In its Memorandum Decision, the court observed that Morrison pled a state law contribution claim but thereafter took the position that the claim was moot. (Doc. 104 at 55). Morrison contends that the court misunderstood its position and that its concession of mootness was meant to apply only if the court granted Morrison contribution under CERCLA. McShares responds that Morrison presented its state law contribution claim in a cursory fashion and, in any event, that any state law claim is preempted by CERCLA. Morrison replies that plaintiffs made a state law claim for contribution in *Sun Company, Inc., supra.* The claim was made pursuant to Oklahoma statute and Judge Kern's discussion was limited to whether the claim was barred by the applicable statute of limitations. Apparently he was not confronted with a preemption argument. The circuit's opinion is silent on preemption.

In *The Matter of Reading Company,* 115 F.3d 1111 (3rd Cir.1997), the court held that CERCLA preempted claims of common law contribution and common law restitution:

[W]e do find a conflict here between Conrail's common law claims for contribution and restitution and the remedies expressly provided in the statute. The conflict arises because the state law remedies obstruct the intent of Congress. As we explain more fully below, when Congress expressly created a statutory right of contribution in CERCLA § 113(f), 42 U.S.C. § 9613(g), it made that remedy a part of an elaborate settlement scheme aimed at the efficient resolution of environmental disputes. Permitting independent common law remedies would create a path around the statutory settlement scheme, raising an obstacle to the intent of Congress. We conclude therefore that Conrail's common law claims are preempted by CERCLA § 113(f).

*Id.* at 1117 (internal case citation omitted).

Morrison does not cite a case holding that state law claims for contribution are *not* preempted by CERCLA. The court's independent research has disclosed no such case. Morrison acknowledges McShares' "cogent argument" that the Tenth Circuit signaled CERCLA preemption in *County Line Investment Co. v. Tinney,* 933 F.2d 1508, 1517, n. 13 (1991) by stating:

In passing, we also note that it would be incongruous for federal law to bar private recovery unless there has been substantial compliance with the NCP, but then permit recovery under a contribution theory through mere compliance with less demanding state regulations.

As this court previously stated in its Memorandum Decision, it is not in the business of predicting how the Tenth Circuit might rule on any issue. However, if parties were commonly avoiding the complex requirements of CERCLA by resort to common law remedies, one would anticipate finding at least a few decisions discussing the use, either pro or con, of that alternative avenue. The absence of such decisions leads the court to believe that CERCLA is generally regarded as preemptive.

Finally, McShares argues that even if Morrison has a state law contribution claim, it failed to establish entitlement to the claim at trial. Morrison has not responded to McShares' argument, which the court deems to be a concession.

### Conclusion

Pursuant to Fed.R.Civ.P. 59(e), this court's Memorandum Decision of May 1, 1998 is amended, as follows:

1. Morrison is granted a declaratory judgment pursuant to 42 U.S.C. § 9613(g)(3) that it has proved elements (A) through (D) of its prima facie showing that McShares is liable or potentially liable under 42 U.S.C. § 9607(a) for the 1963 spill.

2. In the event of a subsequent action or actions to recover future response costs, i.e. costs incurred after the filing of this supplemental decision, Morrison may utilize expert evidence.

3. Morrison's alternative state law claim for contribution is denied and judgment is entered in McShares' favor on that claim.

The clerk is directed to enter judgment pursuant to Fed.R.Civ.P. 58.

IT IS SO ORDERED.